**TOMITA TECHNOLOGIES USA, LLC; Tomita Technologies International, Inc., Plaintiffs,**

v.

**NINTENDO CO., LTD.; Nintendo of America Inc., Defendants.**

No. 11 Civ. 4256 (JSR).

United States District Court, S.D. New York.

Feb. 22, 2012.

Joseph Diamante, Alexander Solo, Ian Gregg DiBernardo, Kenneth Lawrence Stein, Stroock & Stroock & Lavan LLP, New York, NY, for Plaintiffs.

James S. Blank, Paul Isaac Margulies, Scott G. Lindvall, Soumitra Deka, Stephen Joseph Elliott, Kaye Scholer, LLP, New York, NY, for Defendants.

*MEMORANDUM*

JED S. RAKOFF, District Judge.

Tomita Technologies USA, LLC ("Tomita"), the owner of the intellectual property rights of inventor Seijiro Tomita, sues Nintendo Co., Ltd. ("Nintendo") for patent infringement, claiming that the Nintendo 3DS infringes U.S. Patent No. 7,417,664 (the "'664 patent"). On November 22, 2011, the Court heard oral argument regarding how to construe certain terms in the claims of the '664 patent. On December 31, 2011, the Court issued a "bottom-line" order construing the relevant terms. This Memorandum explains the reasons for the Court's bottom-line order.

By way of background, the '664 patent seeks to solve a problem in the technology of three-dimensional or "stereoscopic" imaging. Technicians have long used the same basic approach to project three-dimensional images. *See generally* Declaration of John Merritt dated October 27, 2011 ("Merritt Decl.") ¶¶ 16–28. In the old days, viewers often wore glasses that had blue lenses (over their right eyes) and red lenses (over their left eyes). *Id.* ¶ 21 fig. 3. If the screen displayed one image to those viewers, their eyes would have focused on that image, which would have appeared to be flat and to lie on the surface of the screen. In contrast, if the screen displayed two images, a blue one on the right and a red one on the left, the viewers' right eyes would have focused on the blue image, which they would have seen through the blue lenses, and their left eyes would have similarly focused on the red image. *Id.* Since the viewers' two eyes would have focused on different parts of the screen, the focal point—i.e., the point at which the eyes' lines of sight would have intersected—would have been beyond the surface of the screen, making the image appear to be inside the screen, *i.e.*, to have "three-dimensional" depth. *Id.* To make

this system work, however, the blue and the red images would have to be captured by two different cameras or other instruments positioned to replicate the different locations of each viewer's two eyes. *Id.* ¶ 22.

This system created certain problems, since viewers' distances from the screen varied, as did the sizes of the screens on which presentation occurred. *Id.* This variance changed the viewers' focal points. *Id.* For example, if a viewer was closer to the screen than the presenter anticipated, her eyes' lines of sight would have intersected at a point that was not as far inside the screen as the presenter desired. As a result, the image would have seemed flatter to the viewer than the presenter intended. *Id.* ¶ 30.

In an attempt to address this kind of problem in situations where the viewer has some control over the display, the '664 patent describes an apparatus that records not just two images (e.g., a red and a blue image), but also a variety of other information about the focal point so that a single viewer can adjust the display to attain the desired degree of stereoscopic effect. *Id.* ¶¶ 31–35. For example, if a viewer wants to sit farther from the screen than the presenter anticipated—or even if her eyes are closer together than the average viewer's—she can move the images on the screen closer together so that her focal point does not appear to be too far inside the screen. In other words, whereas three-dimensional presentations once included only one configuration of images, which people in different situations perceived differently, the '664 patent attempts to describe a method for presenting a number of different configurations in the hope of allowing different people to perceive essentially the same thing. *Id.*

■ Against this general background, the Court turns to the terms of the '664 patent. Construction of a patent's claims—"the portion[s] of the patent document that define[ ] the scope of the patentee's rights"—"is exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Courts should interpret a word in a claim according to its "ordinary and customary meaning," *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed.Cir.2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

■ The context provided by the entire patent read as a whole, combined with the record of the patent's proceedings in the Patent and Trademark Office (the so-called "prosecution history"), constitutes "intrinsic evidence" of a term's meaning. *Id.* at 1317. Courts may also consider "extrinsic evidence," *e.g.*, dictionaries and treatises, "as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324. Courts are admonished, moreover, not to construe claims in a fashion that "contribute[s] nothing but meaningless verbiage to the definition of

the claimed invention." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed.Cir. 1997). Moreover, the Court should not construe a claim to protect only examples recited in the specification, which may merely be illustrative. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

■ Under 35 U.S.C. § 112, ¶ 6, where a claim expresses a means "for performing a specified function," but does not specify a structure, "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The construction of a "means-plus-function limitation" under § 112, ¶ 6 has two steps: (1) "determine the claimed function"; and (2) "identify the corresponding structure in the written description that performs that function." *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed.Cir.2005). Use of the words "means" creates a presumption that the means-plus-function limitation applies. *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1427 (Fed.Cir.1997). Nonetheless, "where a claim uses the word 'means,' but specifies no corresponding function for the 'means,' it does not implicate section 112." *Id.* at 1427–28.

The parties have requested that the Court construe ten different claim terms. Before turning to the individual terms, however, the Court notes that one dispute between the parties pertains to several of the terms in question. Specifically, Nintendo argues that the '664 patent does not cover systems in which the "video image pick-up means"—most commonly, cameras—point in parallel directions. According to Nintendo, since parallel lines never cross, if the video image pick-up means

point in parallel directions, they will never focus on the same image, as a viewer's two eyes would. In such a scenario, Nintendo argues, the "distance to [the cross-point] is infinite," and the system envisioned by the '664 patent cannot record any information about the cross-point. *Cf.* U.S. Patent No. 7,417,664 filed (Aug. 26, 2008) (" '664 patent") at 10:51–52.

In further support of this argument/ Nintendo notes that a European patent examiner refused to find that Tomita's European patent application—which was identical to the application for the '664 patent—covered systems in which the video pick-up means pointed in parallel directions. Declaration of Stephen J. Elliott dated October 27, 2011 ("Elliott Decl.") Ex. 2. Apparently in response to the European examiner's decision, Tomita amended its American patent application by deleting at least one instance in which it used the phrase "in a parallel relationship" to describe the video image pickup means. Elliot Decl. Ex, 3 at 86. Thus, Nintendo concludes that the '664 patent disclaims any system in which the video image pick-up means point in parallel directions.

The Court disagrees. The '664 patent specifically claims that it covers systems in which the "two pick-up means ... are disposed in a parallel relationship." '664 patent at 22:30–34; *see also id.* at 3:62–67, 18:29–34. Thus, when the U.S. Patent and Trademark Office approved the '664 patent, its examiner necessarily disagreed with the European examiner on whom Nintendo relies. *Cf. TI Group Automotive Systems (North America), Inc. v. VDO North America, L.L.C.,* 375 F.3d 1126, 1136 (Fed.Cir.2004). The American examiner had good reasons for disagreeing. Stereoscopic systems in which the video image pick-up means point in parallel directions were "well-known at the time of the filing of the '664 patent," Merritt Decl.

¶ 26 & fig. 4, and were known as long ago as 1993, Andrew Woods et al., *Image Distortions in Stereoscopic Video Systems,* Proceedings of the SPIE, Feb. 1993, at 3 & fig. 2, Such systems function by laterally shifting computer chips located behind the cameras' lenses in order to change the cameras' foci without moving the cameras. Merritt Decl. ¶ 26 & fig. 4.

Nor does the Court agree with Nintendo that either the specification or the prosecution history of the '664 patent "clearly disclaim[s]" systems in which the video image pick-up means point in parallel directions. *See Oatey Co. v. IPS Corp.,* 514 F.3d 1271, 1277 (Fed.Cir.2008). Whatever reason Tomita may have had for removing one instance of the phrase "in a parallel relationship" from the specification, that reason apparently did not lead Tomita to remove two similar phrases in the specification. Moreover, given that stereoscopic systems with parallel video image pick-up means were well known at the time of filing, a person of ordinary skill in the art would have understood how to apply Tomita's insights about collecting important information to such stereoscopic systems. *See* '664 patent at 18:29–34. Accordingly, the Court interprets the '664 patent to include systems with parallel video image pick-up means and disfavors interpretations of claim terms that exclude such systems. *Oatey,* 514 F.3d at 1276.

■ Turning to another threshold issue, the parties should note that, where the Court concludes below that a term requires no construction, it does not invite the parties to present their arguments about that term's meaning to the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1362 (Fed. Cir.2008). Rather, in light of the fact that courts must resolve disputes about claim construction, the determination that a claim requires no construction constitutes

a rejection of the narrow construction proposed by Nintendo and a finding that using other words would either restate the claim, albeit slightly differently, or add only meaningless verbiage. *See U.S. Surgical Corp. v. Ethicon*, 103 F.3d 1554, 1568 (Fed.Cir.1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

Turning now to the terms in question, the Court first finds that the term "video image pick-up means" requires no construction, any more than typical such means, cameras, would. Nintendo argues that, because this term includes the word "means," the Court should imply a means-plus-function limitation under § 112, ¶ 6. *Sage Products*, 126 F.3d at 1427. Nonetheless, the patent consistently uses the term "video image pick-up means" to refer to a structural element. *See Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1317 (Fed.Cir.2010) ("The relevant inquiry is whether the term at issue is purely functional."). Video image pick-up means comprise a necessary part of all stereoscopic systems. The purported insight of the '664 patent does not involve picking up images, but instead recording information in order to allow viewers to adjust the display of such images. *See Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed.Cir.2000) ("[T]he claim

must be interpreted in light of the ... purpose of the invention described therein."). Accordingly, the phrase "video image pick-up" is "idle description" of a structural element rather than a part of the patented system's "contemplated function." *Baran*, 616 F.3d at 1317.[1] Because the Court finds the term "video image pickup means" sufficiently clear, it declines to burden it with additional construction.

■ For substantially the same reasons, the Court finds that the term "stereoscopic video image pick-up device ... for outputting video information from said pick up means" requires no construction. Just as all stereoscopic systems must have video image pick-up means, so they must have structural components that receive data from the pick-up means and transform that data into stereoscopic projection. *Cf.* Merritt Decl. ¶¶ 42–43. Accordingly, this term describes only a structural element and not a part of the patented system's contemplated function.

Moreover, while Nintendo urges the Court to regard the term as a means-plus-function limitation, "the presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir.2011). Although parties sometimes rebut this presumption by showing that "there is no structure recited in the limitation that would save it from application of section 112, ¶ 6," *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir.1998), here, the '664 patent recites a structure that those skilled in the art would comprehend, *e.g.*, '664 patent at

---

1. Moreover, even if the term "video image pick-up means" did describe a function, for which the '664 patent discloses only a camera as a structure, § 112, ¶ 6 provides that the '664 patent would cover cameras and "equivalents thereof." The Court does not see how, and Nintendo has not provided any examples in which, a video image pick-up means in a stereoscopic system would not qualify as an equivalent of a camera.

8:18–24. Thus, the Court declines to construe the term as a means-plus-function limitation. Because the Court finds that that the term "stereoscopic video image pick-up device ... for outputting video information from said pick up means" is sufficiently clear, it undertakes no construction of it.

Next, the Court finds that the term "cross-point (CP)" requires no construction. As the term clearly indicates, cross-point means the point on which the images captured by the two video image pick-up means converge, mimicking the focal point of the viewer's right and left eyes. *See* '664 patent at figs. 4–6. Nintendo does not dispute that the term indicates this, but instead invites the Court to incorporate language from the specification that indicates that the cross point will lie "on the surface," *id.* at 1:28, or "plane of the object" captured, *id.* at 9:22.[2] Nonetheless, Nintendo does not explain what such language adds to the definition of cross point. Because courts should avoid constructions that "contribute nothing but meaningless verbiage to the definition of the claimed invention," *Harris Corp.*, 114 F.3d at 1152, the Court declines to give a construction of cross-point that refers to the "surface" or "plane" of the object captured. Moreover, because stereoscopic presentation has long relied on the convergence of two separate images, the Court finds that those of ordinary skill in the art would readily understand the term cross-point, *see* Merritt Decl. ¶ 44, and declines

to burden the term with additional construction.

 Building on the Court's understanding of cross-point, the Court construes the term "cross-point information" to mean "information relating to the cross-point, including information that can be used to determine the distance from the image pick-up means to the cross-point." *See, e.g.*, '664 patent at 9:28–34. Nintendo raises two objections to this construction. First, it argues that the '664 patent defines cross-point information to include only "information on the distance between the cameras and [the cross-point]," *id.* at 9:28–29, and "[t]he distance between the left-eye camera and the right-eye camera (intereye distance)," *id.* at 31–32. Based on these references, Nintendo concludes that cross-point information includes only these three distances. This argument overlooks the fact that these three distances constitute the sides of a triangle. By recording other information about the relevant triangle, such as the angles formed between the optical axes and the line between the two video image pick-up means, one can determine the distances that, according to Nintendo, constitute cross-point information. Moreover, because the '664 patent refers to "information on" the distances described by Nintendo, *id.* at 9:28, the Court construes cross-point information to include not only those specific distances, but also any other "information that can be used to determine" those distances.

**2.** Nintendo also invites the Court to include the term "optical axes" in its construction of cross-point. Nonetheless, because, as described below, the Court rejects Nintendo's narrow construction of "optical axes," it declines to incorporate that construction into the construction of cross-point. Moreover, use of claim terms to define one another creates its own serious problems. For exam-

ple, if the Court concluded that cross-point meant the "point of intersection of the optical axes," then the claim would read: "the [point of intersection of the optical axes] of optical axes." '664 patent at 21:56. Put somewhat differently, because the terms appear alongside one another in the claim, context renders their relation to one another clear.

40

Second, Nintendo argues that the Court's construction of cross-point information should specify that, "if the distance to [the cross-point] is infinite," then "there is no [cross-point] information." *Id.* at 10:51–52. According to Nintendo, by making this acknowledgement about cross-point information, the '664 patent disclaims stereoscopic systems in which the video image pick-up means point in parallel directions. As discussed above, however, stereoscopic systems with parallel video image pick-up means can generate a cross-point that is a finite distance from the pick-up means by, for example, laterally shifting computer chips located inside the means. *See* Merritt Decl. ¶ 26 & fig. 4; *see also* Andrew Woods et al., *Image Distortions in Stereoscopic Video Systems,* Proceedings of the SPIE, Feb. 1993, at 3 & fig. 2. Thus, the language quoted by Nintendo does not constitute a disclaimer.

Moreover, Nintendo takes the quoted language from the '664 patent out of context. According to the '664 patent, "by controlling the timing of read-out of the right-eye video data," the patented system can generate stereoscopic effect "even if" there is no cross-point information. '664 patent at 10:46–52. Because the language Nintendo emphasizes does not indicate that parallel pick-up means will not generate a cross-point—instead noting that the patented system can appropriately deal with the absence of cross-point information, however that absence might occur—the Court sees no reason to refer in its construction of cross-point information to an absence that, by virtue of its apparent insignificance to the patented system, threatens to confuse interpreters.

Next, the Court finds that the term "optical axes" requires no construction. At the time of filing, one of ordinary skill in the art would have understood the meaning of the term optical axis. Merritt Decl. ¶ 48; *see also* Declaration of Jan–Michael Frahm dated October 27, 2011 ¶¶ 15–16. Notwithstanding the accessibility of this term, Nintendo argues by reference to extrinsic evidence that an optical axis must "coincide[ ] with the axis of rotational symmetry of the lens of a pick-up means." Nintendo further claims that figure 14, containing prior art, supports its construction because the optical axes in that figure appear to bisect the cameras. *Cf. Kumar v. Ovonic Battery Co.,* 351 F.3d 1364, 1368 (Fed.Cir.2003) ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence."). Nonetheless, the portion of the patent describing figure 14 makes no reference to axes of rotational symmetry. '664 patent at 1:27–32. The Court sees no reasons to attribute so complicated a concept as "the axis of rotational symmetry" to figure 14 when the '664 patent's description of that figure fails to do so. Moreover, the patent uses the term optical axes interchangeably with "lines of sight." *See* '664 patent at 11:4–7 (describing the "optical cross point of the right and left video images" as "a point at which the right and left lines of sight intersect[ ] with each other").

Most problematically, however, by focusing on "the axis of rotational symmetry," Nintendo apparently asks the Court to construe "optical axes" such that the '664 patent cannot apply to systems with parallel pick-up means, one of the '664 patent's preferred embodiments. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996) ("Indeed, if 'solder reflow temperature' were defined to mean liquidus temperature, a preferred ... embodiment in the specification would not fall within the scope of the patent claim. Such an interpretation is rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case."). If cameras point in parallel

directions, Nintendo argues, lines that bisect their lenses (as in figure 14) will also be parallel, forming no cross-point. But, to repeat once more, systems with parallel cameras can in fact produce cross-points. *See* Merritt Decl. ¶ 26 & fig. 4; *see also* Andrew Woods et al., *Image Distortions in Stereoscopic Video Systems,* Proceedings of the SPIE, Feb. 1993, at 3 & fig. 2.[3] Moreover, Nintendo employs an analytical approach that the Federal Circuit has forbidden, using extrinsic evidence about the definitions of "optical axes" in order to foreclose the most plausible interpretation of the intrinsic evidence. *See Vitronics,* 90 F.3d at 1584 ("[E]xtrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language.... Nor may it contradict the import of other parts of the specification."). Accordingly, the Court rejects Nintendo's unduly narrow construction of the term "optical axes." Moreover, because the Court finds that the alternative construction offered by Tomita does not clarify the term, and that the term is already sufficiently clear, the Court declines to adopt any additional construction.

■ The Court next finds that the term "cross-point measuring means for measuring CP information on the cross-point of optical axes of said pick-up means" is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. The function is "to measure CP information on the cross-point (CP) of the optical axes of the two video pick-up means." The corresponding structure is comprised of a cross-point data

device that determines the cross-point information as described and shown, for example, in figure 1 (where it is identified as number 403) and figure 3 (where it is identified at number 12), and in the '664 patent at 3:50–67, 4:1–6, 8:11–18, 9:23–35, and 18:17–42. Under § 112, ¶ 6, the structure also includes equivalents of the structures described above.

Nintendo objects to this construction, arguing that the figures mentioned above contain only black-box diagrams and that the passages in the specification mentioned above refer only to techniques by which the cross-point measuring means can perform its function. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.,* 612 F.3d 1365, 1376 (Fed.Cir.2010) ("The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." (quoting *Tech. Licensing Corp. v. Videotek, Inc.,* 545 F.3d 1316, 1338 (Fed. Cir.2008))). But in *Telcordia,* the Federal Circuit concluded that, although figures in the relevant patent depicted a "controller" only as a "black box" and "nothing in the figures describe[d] the details of its inner circuitry," the patent "disclose[d] adequate defining structure to render the bounds of the claim understandable to an ordinary artisan" because "an ordinary artisan would have recognized the controller as an electronic device with a known structure," 612 F.3d at 1377. The '664 patent contains similar information, referring to "a cross-point data input device ... which

---

**3.** In fact, the article by Woods et al., published in 1993, distinguishes in the "parallel camera configuration" between the *lenses'* optical axes, which never cross, and the *cameras'* optical axes, which do not point straight out of the camera and which do cross. *Image Distortions in Stereoscopic Video Systems,* Proceedings of the SPIE, Feb. 1993, at fig. 2. This distinction indicates that the extrinsic evidence cited by Nintendo does not exhaust the understanding of optical axes shared by those of ordinary skill in the art at the relevant time.

measures" cross-point information by any of three different techniques. '664 patent at 9:23–35. Moreover, the black-box diagrams indicate that these devices have a specific place in the patented system, namely, inside the stereoscopic image pick-up device. *Id.* figs. 1 & 3. Because devices for measuring cross-point information like those described in the '664 patent were well known to ordinary artisans at the relevant time, the Court concludes that an ordinary artisan would have understood the references to these devices to disclose known structures. *See* Merritt Decl. ¶¶ 50–51, Accordingly, the Court rejects Nintendo's argument that the '664 patent fails to disclose adequate structure.

The Court further determines that the term "offset presetting means for offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device" is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. The Court addresses the function and the corresponding structure in turn. First, the function is "offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by said stereoscopic video image display device." Nintendo argues that the function should also include the '664 patent's reference to "presetting a[n] offset." '664 patent at 9:3; *cf. Apple Computer*, 234 F.3d at 25 ("The claim interpretation Articulate asserts focuses on the words following 'help access window' and ignores the limitation imposed by the word 'help.' "). But the '664 patent more consistently refers to the function at "offsetting and displaying said different video images." '664 patent at 3:25–26; 4:14–15; 21:61–62. Moreover, Nintendo does not describe what the "pre-setting a[n] offset" would mean in the context of the patent. The '664 patent purportedly describes a method for offsetting images in order to preserve a constant ratio between different distances, thus producing consistent stereoscopic effect. *See id.* at 12:15–52, figs. 7 & 8. While the "offset presetting means" requires a default or preset value for the ratio in order to perform the function of offsetting the two images, that value would not constitute a part of the function the means performed, but instead data that the means used to perform that function. Thus, in the absence of any explanation for how "presetting a[n] offset" constitutes a function, the Court refuses to include that language within the description of the functions performed by the "offset presetting means."

Second, the structure corresponding to the "offset presetting means" is comprised of a circuit and a manual entry unit that sets the offset between the right and left eye images. The '664 patent describes various embodiments of this structure in figures 1 and 2, which identify it as number 106, figures 2 and 3, which refer to manual entry of information, figures 4 through 8, and at 3:24–29, 3:39–44, 4:14–19, 4:63–67, 5:21–24; 5:35–37, 5:63–67, 9:3–10, 11:12–12:52, 15:50–67, 16:9–10, 16:15–16, 17:58–63, 18:6–11, 18:49–54, 19:31–35, 19:56–59, and 20:3–5. Under § 112, ¶ 6, the structure also includes equivalents of the structure described above.

While Nintendo argues that the '664 patent fails to disclose adequate structure, the patent specifically discloses, for example, that a "stereoscopic video image signal generating circuit 101 offsets and displays the right-eye and left-eye video images." '664 patent at 15:52–54; *see also Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed.Cir.2003) ("While we do not find it necessary to hold that the term 'circuit'

by itself always connotes sufficient structure, the term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art."). Moreover, in its alternative argument, Nintendo fails to provide a plausible explanation for why the Court should refer only to the structures Nintendo emphasizes rather than the other structures disclosed by the '664 patent. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed.Cir.1999) ("A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures."). Instead, Nintendo argues, somewhat curiously, that the Court should limit the term to the structure disclosed in figure 3 because figures 2 and 3 disclose the essentially the same structure. Even if Nintendo's claim were true, it would justify finding that both figures disclose (the same) structure, not limiting the term to the structure disclosed in one. Accordingly, the Court finds that that the term encompasses all of the structure referenced in the passages of the '664 patent cited above.

■ Next, the Court finds that the term "calculates the cross-point based upon the position of picking-up of an object in said two pick-up means" means "calculates the cross-point based upon the position of an object in the images picked up by the two pick-up means." Nintendo first argues that this term is indefinite because, where cameras point in parallel directions, their optical axes will not generate a cross-point, preventing the calculation of any cross-point. The Court has already addressed and rejected this argument above. In the alternative, Nintendo argues that the Court should substitute the phrase "computes mathematically" for the word calculates. Nonetheless, Nintendo does

not indentify any place in the specification where "computes mathematically" appears, instead relying on extrinsic evidence. Because the Court finds that the term "calculates" has a readily apparent, ordinary meaning, it finds that additional construction will not clarify this term and declines to impose any.

Similarly, the Court finds that the term "disposed in a parallel relationship" requires no construction. Nintendo argues in favor of a construction that clarifies that the system's pick-up means are disposed in this relationship. However, the '664 patent already makes this fact abundantly clear by referring to "two pick-ups means which are disposed in a parallel relationship." '664 patent at 22:34–35. Accordingly, the Court finds Nintendo's construction unhelpful and declines to adopt it.

Finally, the Court finds that the term "stereoscopic feeling" requires no construction. Nintendo argues that this term is indefinite. Nonetheless, "[i]f the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research and Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed.Cir.2001). The meaning of "stereoscopic feeling" is not only discernible, but is obvious from the context of the '664 patent. Specifically, the '664 patent attempts to recreate a stereoscopic viewing experience by preserving the ratio between certain, important distances. Reference to this ratio provides an "objective standard" that renders the term "stereoscopic feeling" definite. *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1350 (Fed.Cir. 2005). "Stereoscopic feeling" increases and decreases as the ratio changes, alternately augmenting and reducing the per-

44

ceived depth of the displayed image. The fact that the viewer can manipulate the ratio according to her preferences changes nothing. Therefore, because the Court finds that the parties' proposed construction does not clarify the term and does not resolve any dispute between them, the Court declines to construe the term.

In sum, for the foregoing reasons, the Court reaffirms the claim constructions contained in its bottom-line order dated December 31, 2011.